## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE PLASTIC SURGERY CENTER, P.A., <br><br> Plaintiff, <br><br> v. <br><br> AETNA LIFE INSURANCE COMPANY, *et al.*, <br><br> Defendants. | Case No. 23–cv–21439–ESK–AMD <br><br><br> OPINION |
| THE PLASTIC SURGERY CENTER, P.A., <br><br> Plaintiff, <br><br> v. <br><br> AETNA LIFE INSURANCE COMPANY, *et al.*, <br><br> Defendants. | Case No. 23–cv–21448–ESK–AMD |
| THE PLASTIC SURGERY CENTER, P.A., <br><br> Plaintiff, <br><br> v. <br><br> AETNA LIFE INSURANCE COMPANY, *et al.*, <br><br> Defendants. | Case No. 23–cv–21470–ESK–AMD |

THE PLASTIC SURGERY
CENTER, P.A.,

        **Plaintiff,**

    v.

AETNA LIFE INSURANCE
COMPANY, *et al.*,

        **Defendants.**

**Case No. 23–cv–21515–ESK–AMD**

**KIEL, U.S.D.J.**

Pending before the Court are four of 47 related cases.[1]  In each of the cases, plaintiff, the Plastic Surgery Center P.A. (the Center), seeks reimbursement of fees from defendant Aetna Life Insurance Company for surgical procedures performed on the Center's patients.  The parties requested leave for Aetna to file motions to dismiss in these four cases, which they believe present claims representative of the claims in the remaining cases.  I granted the parties' request and stayed further proceedings in the other 43 cases. (Case No. 23–21439 (K.R. Case) ECF No. 65.)  Because the claims in the two cases involving patients with insurance plans that provide out-of-network benefits are preempted by the Employee Retirement Income Security Act (ERISA), these cases will be dismissed.  Another case will be dismissed for failure to state a claim.  Two of the three counts in the fourth action will be permitted to proceed.

---

[1] *See* Case Nos. 23–21444; 23–21450; 23–21452; 23–21464; 23–21465; 23–21473; 23–21481; 23–21498;23–21507; 23–21510; 23–21513; 23–21517; 23–21518; 23–21530; 23–21536; 23–21542; 23–21547; 23–21558; 23–21560; 23–22397; 24–01446; 24–01460; 24–01465; 24–08495; 24–08497; 24–08528; 24–08530; 24–08535; 24–08539; 24–08591; 24–08593; 24–08603; 24–08607; 24–08644; 24–cv–08650; 24–08664; 24–08727; 24–09092; 24–09102; 24–09119; 24–09130; 24–09140; and 24–09159.

The fours motions to dismiss (Motions) were filed at ECF No. 76 in K.R. Case, at ECF No. 23 in Case No. 23–21448 (C.S. Case), at ECF No. 24 in Case No. 23–21470 (M.T. Case), and at ECF No. 21 in Case No. 23–21515 (N.D. Case)).   Aetna filed briefs in support of the Motions.   (K.R. Case ECF No. 76–1 (K.R. Mov. Br.); C.S. Case ECF No. 23–1, (C.S. Mov. Br.); M.T. Case ECF No. 24–1 (M.T. Mov. Br.); N.D. Case ECF No. 21–1 (N.D. Mov. Br.).)   The Center filed oppositions to the Motions (K.R. Case ECF No. 76–10 (K.R. Opp'n Br.); C.S. Case ECF No. 23–10 (C.S. Opp'n Br.); (M.T. Case ECF No. 24–7 (M.T. Opp'n Br.); N.D. Case ECF No. 21–10 (N.D. Opp'n Br.)) and Aetna filed replies to the oppositions (K.R. Case ECF No. 76–13; C.S. Case ECF No. 23–13; M.T. Case ECF No. 24–8; N.D. Case ECF No. 21–13).[2]   I held a hearing on the motions on February 25, 2026.   (N.D. Case ECF No. 31.)

## I.    FACTUAL BACKGROUND

The Center is a New Jersey corporation specializing in plastic and reconstructive surgery.   (K.R. Case ECF No. 66 (K.R. Am. Compl.) ¶¶1, 4).   Aetna is a health insurance company authorized to conduct business in New Jersey.   (*Id.* ¶2.)   Aetna served as the authorized agent and administrator of various health benefit plans under which the Center's patients were covered. (*See, e.g., id.*) [3]

---

[2] The Center also filed two notices of supplemental authority in K.R. Case and M.T. Case.   (K.R. Case ECF Nos. 80, 82; M.T. Case ECF Nos. 28, 30.)   Aetna filed a response to the notices.   (K.R. Case ECF No. 81; M.T. Case ECF No. 29.)   The Center also submitted supplemental notices in the other two cases.   (C.S. Case ECF No. 27; N.D. Case ECF No. 25.)

[3] Citations to "e.g." refer to statements that are also supported by the other complaints.

The Center is not a participating provider under its patients' health benefit plans.    (*Id.* ¶ 5.)[4]    In each of the four cases, the Center alleges that it entered into an agreement with Aetna to perform surgical procedures on the Center's patients in exchange for payment at an in-network rate    (*See e.g.*, *id.* ¶¶ 12–18.)

### A.    K.R. Case

K.R. was diagnosed with recurring breast cancer and underwent a bilateral mastectomy.  (K.R. Am. Compl. ¶ 6.)  Following the surgery, Dr. Hakan Usal and Dr. Gary Breslow determined that K.R. needed a bilateral breast reconstruction.  (*Id.* ¶¶ 8, 11.)  After initially refusing to perform the procedure under standard out-of-network terms, the Center alleges that on or about October 29, 2020, it entered into an agreement with Aetna to perform K.R.'s surgery in exchange for compensation at the "highest in-network rate." (*Id.* ¶¶ 13–17.)  The Center claims that the agreement as to K.R. was confirmed in an October 28, 2020 preauthorization letter.  (*Id.* ¶ 21.)  The letter states that it "confirms coverage approval for a higher benefit level of coverage with applicable coinsurance as described in your health benefits plan document" and lists Dr. Usual and Dr. Breslow as providers with "Approved Benefit Level" at "Pay at highest in network benefit."  (ECF No. 76–4 p.3.)  The letter states that K.R.'s plan includes an out-of-network benefit level for non-participating providers, and that prior approval is required to obtain the in-network benefit level for non-participating providers. (*Id.*)  It also states that "[r]eimbursement will be based on standard coding and bundling logic and any mutually agreed upon contracted or negotiated rates, subject to any and all copays or coinsurance requirements."  (*Id.* p.5)

---

[4] Aetna describes its relationship with the Center as, "an out-of-network provider with Aetna, meaning it does not have a written contract setting the rate of reimbursement for services rendered to Aetna's members."  (K.R. Mov. Br. p.11.)

The surgery was performed or November 10, 2020, and the Center billed Aetna $219,000 for the procedure—purportedly the "highest in-network rate." (K.R. Am. Compl. ¶¶ 24, 26, 27.)   Aetna reimbursed the Center $40,466 for the surgery.   (*Id.* ¶ 27.)

### B.    C.S. Case

C.S. was diagnosed with a perineal incisional hernia and required perineal reconstruction surgery.   (C.S. Case ECF No. 15 (C.S. Am. Compl.) ¶¶ 6, 10.) On June 18, 2020, the Center's representative contacted Aetna and offered to perform the surgery at an in-network rate. (*Id.* ¶ 15).   Also on June 18, 2020, Aetna issued a letter "confirming that [the Center] would be compensated at the in-network rate …."   (*Id.* ¶ 20.)   On July 6, 2020, the Center and Aetna purportedly entered into a single case rate of the in-network rate for certain provided CPT codes.   (Id. ¶¶ 16–18.)

On July 16, 2020, C.S.'s surgeon performed the surgery. (C.S. Am. Compl. ¶ 23.)   The Center billed Aetna $247,595 for the surgical services performed by its surgeon and assistant surgeon, for which Aetna reimbursed the Center $15,021.19.   (*Id.* ¶¶ 25–29.)

### C.    M.T. Case

M.T. was diagnosed with a right-side brachial plexus injury that needed surgery.  (M.T. Case ECF No. 14 (M.T. Am. Compl.) ¶¶ 6, 10.)   M.T.'s plan provided for benefits for non-participating providers.   (*Id.* ¶ 11.)   The Center alleges that before performing surgery it contacted Aetna to negotiate a "single case rate agreement."   (*Id.* ¶ 16.)   On October 1, 2021, Krista Hernandez**,** the Center's employee, "offered to perform" the surgery "in exchange for compensation at the *'highest in-network rate.'"*   (*Id.* ¶ 15 (emphasis added)). On October 11, 2021, an Aetna representative allegedly agreed to reimburse the Center at the highest in-network rate, to which the Center agreed not to balance-bill the patient.   (*Id.* ¶¶ 16–18).   Surgery took place on November 9,

2021. (*Id.* ¶ 22.) The Center billed Aetna $134,697 for the surgery, for which Aetna reimbursed the Center $3,280.46. (*Id.* ¶¶ 24–28.)

### D. N.D. Case

N.D. was diagnosed with breast cancer and required a breast reconstruction, including immediate placement of tissue expanders and acellular dermal matrix, contemporaneous with a bilateral mastectomy. (N.D. Case ECF No. 1–1 (N.D. Compl.) ¶¶ 5–7.) On November 4, 2021, the Center's representative contacted Aetna to "start a network exception." (N.D. Case ECF No. 21–6 (N.D. Nov. 4, 2021 Tr.) p. 5:16–18.)[5] The Center was out of network. (*Id.* p. 5:22.) The call transcript shows that the Center's representative provided patient, provider, diagnosis, and facility information as well as CPT codes and was told that coverage was not guaranteed. (*Id.* pp. 3:14–4:19, 7:23–25, 12:19–13:1, 20:16–23.)

The Center alleges that on November 17, 2021, Aetna agreed to compensate the Center at the highest in-network rate in exchange for its performance of the surgery and that the parties listed the CPT codes constituting the surgery. (N.D. Compl. ¶ 8.) The call transcript shows that the Aetna representative stated that Aetna had completed a "peer to peer" review and would "approve [the surgery] at an in network rate." (ECF No. 21– 7 (N.D. Nov. 17, 2021 Tr.) p. 4:15–21.) The transcript also reflects the Aetna representative stating that Aetna would "mark the provider itself that pay the highest" (*id.* p. 5:6–8.) which the Center interprets as confirmation of the highest in-network rate (N.D. Compl. ¶ 8). That same day, Aetna issued a preauthorization letter addressed to N.D. and the Center, stating that coverage was approved "at highest in network benefit." (ECF No. 21–4 p. 3.)

---

[5] The Court's citations to transcripts refer to the pages in the electronic filing, not necessarily the pages of the transcript itself.

N.D. underwent the surgery on December 29, 2021 for which the Center billed Aetna $327,624 and Aetna paid $5,249.74   (N.D. Compl. ¶¶ 9–16.)

In each case, the Center alleges that Aetna paid less than the agreed-upon rate.   (*See e.g.*, K.R. Am. Compl. ¶ 27.)   And that the amount the Center billed Aetna represents that rate.   (*See, e.g.*, *id.* ¶¶ 26–27)   The Center asserts the following claims against Aetna: (1) breach of contract; (2) promissory estoppel; and (3) negligent misrepresentation (collectively, the State Law Claims).

## II.   STANDARD

### A.   Motions to Dismiss

Prior to the filing of a responsive pleading, a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).   To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" *Doe v. Princeton Univ.*, 30 F.4th 335, 341 (3d Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)), and—accepting the plaintiff's factual assertions, but not legal conclusions, as true—"'plausibly suggest[]' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *id.* at 342 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   Courts further evaluate the sufficiency of a complaint by "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

## III. DISCUSSION

### A.    <u>Documents Integral to the Complaints</u>

Aetna includes exhibits to its motions, including transcripts of calls between the Center and Aetna's representatives, summaries of the patients' plans, and preauthorization letters (collectively, Documents).[6]   Generally, at the motion to dismiss stage, a court may not consider material extraneous to the pleading unless it is "integral to or explicitly relied upon in the complaint." *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 459 (D.N.J. 2020) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).   Such material includes exhibits attached to the complaint, matters of public record, and undisputedly authentic documents so long as the plaintiff's claims are based on those documents.   *Id.*

Here, I can consider the Documents because they are integral to the complaints and are explicitly relied upon by the Center. *See Princeton Neurological Surgery, P.C. v. Aetna, Inc.*, 22–01414, 2023 WL 2307425, \*4 (D.N.J. Feb. 28, 2023) (finding that although the plaintiff did not attach any exhibits to its complaint, the court could consider the preauthorization letter and two call transcripts included with the defendants' motion).   In each case, the State Law Claims are based upon communication between the Center and Aetna concerning the terms of their alleged agreements.

### B.    <u>ERISA Preemption</u>[7]

Aetna claims that K.R. and M.T.'s plans are governed by ERISA and, therefore, the State Law Claims are preempted by Section 514.   (K.R. Mov. Br.

---

[6] The Documents are accompanied by explanatory declarations.   (*See* K.R. Case ECF No. 76–2; C.S. Case ECF No. 23–2; M.T. Case ECF No. 24–2; N.D. Case ECF No. 21–2.)   No preauthorization letter was submitted with Aetna's papers in support of its motion to dismiss in M.T. Case.

[7] This section is limited to the State Law Claims in K.R. Case and M.T. Case.

pp.18–26; M.T. Mov. Br. pp.17–24.) [8]   Section 514(a) provides that "the provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan …."   29 U.S.C. §1144(a).   A state law relates to an employee benefit plan in two ways: (1) a "reference to"; or (2) "connection with" that plan.   *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Comp.*, 967 F.3d 218, 226 (3d Cir. 2020) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983)).   State law claims that impermissibly reference ERISA plans include not only claims that "act[] immediately and exclusively upon ERISA plans," but also those that are premised on the plans.   *Id.* at 230 (alteration in original) (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319–320 (2016)).   Claims that are premised on ERISA plans include (1) claims predicated on the plan or its administration or for which the plan is critical in establishing liability and (2) claims involving construction of the plan or requiring an interpretation of its terms.   *Id.*

Aetna argues that the State Law Claims require an impermissible reference to K.R. and M.T.'s plans because interpreting the plans is necessary to determine whether Aetna paid an insufficient amount to the Center pursuant to the alleged agreements.   (K.R. Mov. Br. pp.18, 19; M.T. Mov. Br. pp.17, 18.) The Center counters that it seeks to enforce independent agreements, not provisions of the plans.   (K.R. Opp'n Br. pp.24–29; M.T. Opp'n Br. pp.23–28.)

The decision in *Princeton Neurological Surgery* is instructive.   In that case, the dispute arose from a surgery performed by the plaintiff, an out-of-network provider, on a patient, J.R.   2023 WL 2307425 at *1.   The physician performed the surgery following a telephone call with—and an authorization letter from—the insurer.   *Id.*   The provider billed the insurer $304,715.00, of which the insurer paid $3,319.36.   *Id.* at *1–2.   The court found that the

---

[8] The Center does not dispute that K.R. and M.T.'s health benefit plans are governed by ERISA.

phone call and authorization letter did not create an independent agreement between the parties to pay for J.R.'s surgery and, thus, ERISA preempted the out-of-network provider's state law claims. *Id.* at *5–6. The court reasoned that the phone call consisted of information about the terms of J.R.'s plan and that the insurer's preauthorization approval letter was issued pursuant to the plan. *Id.* The court further noted that the out-of-network provider's "request for payment was pursuant to the terms of J.R.'s [p]lan allowing for out-of-network benefits, rather than any independent representations or promises" the insurer made in the phone call or letter. *Id.* at *6.

I find *Princeton Neurological Surgery* persuasive. With respect to K.R., Dr. Breslow's office, on the Center's behalf, called Aetna on October 19, 2020 to update a precertification prior to K.R.'s surgery, as required by K.R.'s plan. (ECF No. 76–6 p.3:7–9.) [9] During the October 19 call, the Center also requested "an in-network exception" for "a higher benefit level" from Aetna for K.R.'s surgery under K.R.'s plan. (*Id.* p.8:4–18.) Aetna's October 28, 2020 authorization letter confirmed "coverage approval for a higher benefit level of coverage … as described in [K.R.'s] health benefits plan" with payment at the "highest in network benefit." (K.R. Case ECF No. 76–4 p.3.) [10] The representations made during the phone calls and the details of the authorization letter, which are the basis for the State Law Claims, demonstrate that the plan was central to the letter and phone conversations, rather than independent or separate from K.R.'s plan. *See Est. of Jennings v. Delta Air Lines, Inc.*, 126 F. Supp. 3d 461, 466 (D.N.J. 2015) ("A state law cause of action 'relates to' an [ERISA] plan if, without the plan, there would be no cause of

---

[9] K.R.'s plan requires precertification for out-of-network providers like the Center. (K.R. Case ECF No. 76–3 p.15.)

[10] The Center called Aetna on October 29, 2020 to follow-up on clinical documents that were submitted by the Center on October 16, 2020. (K.R. Case ECF No. 76–7.)

action." (quoting *1975 Salaried Ret. Plan for Eligible Emps. of Crucible, Inc. v. Nobers*, 968 F.2d 401, 406 (3d Cir. 1992)).

The same principles apply to M.T's surgery.   On October 1, 2021, prior to M.T.'s surgery, the Center's representative called Aetna to request the status of an authorization[11] and to update the date of service on the authorization. (M.T. Case ECF No. 24–5, p.3:6–9.)   Like K.R.'s plan, M.T's plan refers to precertification for out-of-network providers.   (M.T. Case ECF No. 24–3 p.36.) And like K.R. Case, the October 1 and October 11, 2021 phone call transcripts show that M.T.'s plan was directly and indirectly at the center of the conversations between the parties.   Even when considering the allegations that the agreement is separate from the plan ratified during the October 11, 2021 phone call (*see* M.T. Am. Compl. ¶¶ 16, 20, 21), the Documents (*see* M.T. Case ECF No. 24–3; ECF No. 24–5; ECF No. 24–6) do not show that the parties discussed payment at the "highest in-network rate" or reimbursement at that rate for M.T.'s surgery.   *See E. Coast Plastic Surgery v. Aetna Inc.*, 18–09429, 2019 WL 2223942, at *3 n.7 (D.N.J. May 23, 2019) ("[W]hen a document and the factual allegations contradict, the document controls.").   Accordingly, ERISA preempts the State Law Claims in both cases. *See Advanced Orthopedics and Sports Med. Inst., P.C. v. Oxford Health Ins., Inc.*, 21–17221, 2022 WL 1718052, at *8 (D.N.J. May 27, 2022) (finding that a separate agreement independent of an ERISA plan did not exist between the plaintiff out-of-network provider and defendant insurer because "the pre-authorization letter indicates that the insurer looks to the ERISA plan to determine both the scope of any services eligible for reimbursement, and the amount of any subsequent payment").

---

[11] Based on my reading of the briefs, complaint, and the Documents, "authorization" is synonymous with certification and approval.

11

To the extent the Center relies on *Plastic Surgery Center* [12] in its oppositions, these cases are distinguishable.  Unlike the patients' plans in *Plastic Surgery Center*, K.R. and M.T.'s plans provide out-of-network benefits for medical services.  Critical to the Third Circuit decision was the fact that the out-of-network provider's state law claims "arose precisely because there was no coverage under the plans for services performed by an out-of-network provider like the" plaintiff.  *Plastic Surgery Ctr.*, 967 F.3d at 231.  The court further stated that "absent a separate agreement between [the out-of-network provider and the insurer], there was no obligation for the [the provider] to provide services to the plan participants, no obligation for [the insurer] to pay the [provider] for its services, and no agreement that compensation would be limited to benefits covered under the plan."  *Id.*  That is not the case here.  Accordingly, K.R. Case and M.T. Case will both be dismissed.

### C.      **Breach of Contract**[13]

A breach-of-contract claim under New Jersey law requires (1) the parties to have entered into a contract containing certain terms, (2) performance as required by the plaintiff, (3) failure to perform as required by the defendant, and (4) the defendant's breach to have caused a loss for the plaintiff.  *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021).  The Center alleges that Aetna

---

[12] In that case, two patients were provided services by an out-of-network provider that contracted with the insurer for "a reasonable amount for those services according to the terms of the [p]lan" in one instance and the "highest in[-]network level" in the other.  967 F.3d at 223–24 (alteration in original).  Subsequent to the services rendered, the insurer paid less than allegedly promised for some services and declined to pay for other allegedly agreed-upon services altogether.  *Id.* at 224.  The Third Circuit concluded that the provider's breach of contract and promissory estoppel claims, as pleaded, did not require more than a cursory review of the patients' plans.  *Id.* at 233–34.

[13] This section and sections III.D and E *infra* are limited to C.S. Case and N.D. Case.

breached its contracts with it by failing to pay the in-network rate for C.S. and usual customary and reasonable rate for N.D. (C.S. Am. Compl. ¶¶ 32–35; N.D. Compl. ¶¶ 19–23.) Aetna argues that the call transcripts do not support the Center's position that a contract was formed. (C.S. Mov. Br. pp. 16–31; N.D. Mov. Br. pp. 16–31.) This includes a failure to evidence a meeting of the minds or agreed-upon price. (C.S. Mov. Br. pp. 23–25; N.D. Mov. Br. pp. 24, 25.)

The Center counters that it has adequately alleged that Aetna members required specialized services, it initially refused to perform the surgeries pursuant to the out-of-network benefits available, and it sought to enter—and entered—into contracts with Aetna for alternative compensation. (C.S. Opp'n Br. pp. 12, 13; N.D. Opp'n Br. pp. 13, 14.) The parties' understanding was that the Center would be compensated at the in-network rates and all ambiguity should be resolved in favor of the Center. (C.S. Opp'n Br. 16–20; N.D. Opp'n Br. pp. 14–18.) Caselaw within this Circuit and District supports its position. (C.S. Opp'n Br. 20–24; N.D. Opp'n Br. pp. 19–23.)

The Center's counsel clarified during the February 25, 2026 hearing that its position is that contracts were formed during the telephone calls and subsequent letters mailed to the plan beneficiaries merely further evidence those contracts. So I turn my attention to the contents of the call transcripts.

In N.D. Case, the Center's representative contacted Aetna for a network exception on November 4, 2021. (N.D. Nov. 4, 2021 Tr. pp. 5:14–6:5.) The Center's representative provided CPT and diagnosis codes, confirmed the date of service, and was informed that the request was pending and coverage was not guaranteed. (*Id.* pp. 12:19–14:10, 20:4–23.) An Aetna representative called the Center on November 17, 2021 to provide a determination. (N.D. Nov. 17, 2021 Tr. p. 4:4–6.) The representative stated that the service was "approve[d] … at an in network rate." (*Id.* p. 4:15–21.)

Aetna may be of the mind that the "allegations are far from a particular payment term or definitive promise" (N.D. Mov. Br. p. 24), but I agree with the Center that the allegations as supported by the call transcripts demonstrate a separate agreement for performance and payment (N.D. Opp'n Br. pp. 13, 14). To find otherwise would be to ignore Aetna's express approval at an in-network rate—as oppose to benefit level—a distinction discussed at length during the February 25, 2026 hearing. That the agreement was not accompanied by a specific dollar figure is of no matter and—as other courts within this District have found—can be fleshed out in discovery. *See, e.g., Plastic Surgery Ctr., P.A. v. UnitedHealthcare Ins. Co.*, 24–10856, 2025 WL 2918662, at *6 (D.N.J. Oct. 14, 2025).

I am satisfied that the Center has adequately pleaded the existence of an agreement to pay the Center an in-network rate and, after the Center's performance, Aetna breached by remitting insufficient payment. Aetna's motion will therefore be denied as to the breach-of-contract claim in N.D. Case.

C.S. Case is supported by distinct facts. On June 18, 2020, the Center's representative called Aetna to initiate a precertification and provided CPT and diagnosis codes. (C.S. Case ECF No. 23–6 pp. 4:7–5:2.) Precertification was entered but coverage was not guaranteed. (*Id.* pp. 7:23–8:8.) Another representative of the Center called Aetna to "go over" procedure codes on July 6, 2020. (C.S. Case ECF No. 23–7 p. 4:5–7.) The codes were approved (*id.* p. 7:1–4) but absent from the call was any reference to a particular rate of compensation.

Insofar as the alleged contract was formed during the calls, I disagree with the Center that the transcripts depict a meeting of the minds. While the Center argues that "[t]he intention of the parties is made plain by their conduct prior, during, and subsequent to the formation" of the separate agreement (C.S. Opp'n Br. p. 19), those intentions—including the Center's refusal to otherwise

perform the surgery—are not depicted in the transcripts the Center has argued evidence a contract.

The Center also points to the parties' repeated conduct to support the existence of a separate agreement. (*Id.* pp.22, 23.) Such conduct may exist elsewhere, but the Center's reference to ongoing litigation between the parties (*id.*) logically cuts against a finding that the parties were of the same mind at the time of the calls. *See Premier Orthopaedic Assocs. of S. NJ, LLC v. Anthem Blue Cross Blue Shield*, 675 F. Supp. 3d 487, 494–95 (D.N.J. 2023) (finding that the complaint failed to allege prior agreements that would have led the plaintiff to believe that a contract had been formed and the plaintiff's status as an out-of-network provider suggested no prior relationship between the parties). The Center has thus failed to meet its burden of demonstrating that an enforceable contracted existed, *Lee v. United Airlines, Inc.*, 18–14772, 2021 WL 2679891, at *6 (D.N.J. June 29, 2021), and its breach-of-contract claim will be dismissed with leave to amend.

### D.   Promissory Estoppel

A promissory estoppel claim consists of four elements: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Goldfarb*, 245 A.3d at 577 (quoting *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 944 A.2d 1, 19 (N.J. 2008)).

The Center alleges that it reasonably relied on Aetna's promises to remit payment by performing the relevant surgeries and Aetna subsequently failed to pay as promised. (C.S. Am. Compl. ¶¶37–43; N.D. Compl. ¶¶25–32.) Aetna claims that the Center fails to establish a promise in its allegations or the call transcripts. (C.S. Mov. Br. pp.16–31; N.D. Mov. Br. pp.16–31.) The Center responds that these cases stem from its desire to be paid above what it otherwise would have been entitled to under the plans, Aetna's related promises

of higher payment, and the damages it suffered when Aetna failed to remit full payments.   (C.S. Opp'n Br. p. 25; N.D. Opp'n Br. p. 24.)

The above review of the call transcripts remains relevant here.   In N.D. Case, the Aetna representative stated that the service was "approve[d] … at an in network rate."   (N.D. Nov. 17, 2021 Tr. 4:15–21.)   The purpose of the call itself was to provide the Center with a determination.   (*Id.* p. 4:4–6.)   The complaint alleges that, in reliance on Aetna's promise, the Center performed the surgery and was paid a fraction of what was promised.   (N.D. Compl. ¶¶ 27, 28.)   This is sufficient to support its promissory estoppel claim.   *See Plastic Surgery Ctr., P.A.*, 2025 WL 2918662, at *6–7.

The C.S. Case allegations, on the other hand, fall short in that the call transcripts do not contain a clear and definite promise.   Like the Center's breach-of-contract claim above, I do not find that the recitation of procedure codes during the July 6, 2020 call establishes a clear and definite promise.   The Center's promissory estoppel claim as to C.S. Case will therefore be dismissed without prejudice.   *See Premier Orthopaedic Assocs. of S. NJ, LLC*, 675 F. Supp. 3d at 495 (concluding that the preauthorization relied upon was insufficient to support the plaintiff's promissory estoppel claim).

### E.    Negligent Misrepresentation

A negligent misrepresentation claim consists of (1) an incorrect statement, (2) made negligently, (3) that was justifiably relied upon, (4) with that reliance resulting in economic loss.   *Cadre v. Proassurance Cas. Co.*, 257 A.3d 1175, 1192 (N.J. Super. Ct. App. Div. 2021).

The Center claims that Aetna represented that it would be compensated at particular rates, those representations were false, Aetna owed it a duty to not make false representations, and after its justifiable reliance Aetna paid it a lesser amount.   (C.S. Am. Compl. ¶¶ 45–50; N.D. Compl. ¶¶ 34–39.)   Aetna contends that the call transcripts show that no misrepresentation was made,

16

promises to pay in the future are not misrepresentations of present or past fact as required for negligent misrepresentation, and no duty of care was owed to the Center. (C.S. Mov. Br. pp. 31–34; N.D. Mov. Br. pp. 32–34.) The Center maintains that Aetna represented that it would pay it in-network rates, did not do so, and that a duty of care was owed by virtue of the parties' privity of contract. (C.S. Opp'n Br. pp. 25, 26; N.D. Opp'n Br. pp. 24, 25.)

For C.S. Case, the story remains the same. I do not read the June 18, 2020 and July 6, 2020 call transcripts to include a representation by Aetna to pay an in-network rate. The Center therefore is without an underlying misrepresentation and—to the extent the parties believe a duty is necessary for the claim—without a contract underlying purported privity between the parties. The negligent misrepresentation claim in C.S. case will therefore be dismissed without prejudice.

The negligent misrepresentation claim in N.D. Case must fail for a different reason. The economic loss doctrine precludes tort claims in which the alleged tort includes breach of a contractual promise. *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 418 (D.N.J. 2021). To determine whether the doctrine applies, courts look to "whether the plaintiff's entitlement to economic losses flows directly from obligations set forth in a contract." *Id.* (quoting *State Cap. Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 678 (D.N.J. 2009)).

Here, the same agreement and amount supporting the N.D. Case breach-of-contract claim also supports the negligent misrepresentation claim. (N.D. Compl. ¶¶ 19, 20, 34, 35.) Negligent misrepresentation claims have been dismissed under like circumstances. *See Plastic Surgery Ctr., P.A.*, 2025 WL 2918662, at *7. The negligent misrepresentation claim for N.D. Case will also be dismissed without prejudice.

## IV.  CONCLUSION

For the foregoing reasons, the Aetna's motions to dismiss K.R. Case and M.T. Case will be granted as the claims are preempted.   The motion to dismiss C.S. Case will be granted for failure to state a claim.   Finally, the motion to dismiss N.D. Case will be granted in part and denied in part.   The breach-of-contract and promissory estoppel claims in N.D. Case will be permitted to proceed.   An appropriate order accompanies this opinion.

_/s/ Edward S. Kiel_
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Date: March 25, 2026